UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

JOSEFINA ALICIA GUAJARDO, JOSE      §
ALBERTO LARA, JUAN MANUEL           §
RODRIGUEZ-MORALES, GUADALUPE        §
GARZA, NOE LONGORIA,                §
GUADALUPE LERMA, FRANCISCO          §
VILLASANA, JOSE LUIS VILLASANA,     §
ROSA IDALIA RIOS, ALAN              §
LONGORIA, JEREMIA RAMOS,            §
CHRISTOPHER LONGORIA, ALFREDO       §
SOTO, FRANK FLORES, PEDRO           §
MARCOS HINOJOSA, RUBEN              §
CASTILLO, ISRAEL MARTINEZ, JESUS    §
PUERTAS, JOSE MONSERRATO            §
RIVERA-LOZOYA, GUADALUPE            §
SANTOS RIVERA-LOZOYA, SANTOS        §
GUADALUPE RIVERA-LOZOYA,            §
HOMERO GUADALUPE RIVERA-            §
FLORES, DOROTEO MOYA-GARCIA,        §
JUAN RUPERTO MORENO-FUENTES,        §
JUAN GABRIEL MENDOZA-               §
RODRIGUEZ, JOSE RAUL GONZALEZ-      §
RODRIGUEZ, JOSE ERASMO              §
GONZALEZ-RODRIGUEZ, ABDIEL          §
ELISEO GARZA-RIVERA, RICARDO        §
FUENTES-BORREGO, JOSE ARJELIO       §
FUENTES-BORREGO, MIGUEL ANGEL       §
ESPINOZA-SANCHEZ, WVENCE            §
CAMARILLO-VEGA, JUAN JOSE           §
CAMARILLO-LOPEZ, LIZANDRO           §
CAMARILLO-VEGA, ELISEO              §
BORREGO-GARZA, ROBERTO              §
SANCHEZ-TREVINO, JUAN ALEJO         §
VILLEGAS-SANCHEZ, CARLOS            §
ANTONIO VILLEGAS-SANCHEZ,           §
ADRIAN CASIMIRO RODRIGUEZ           §
-GARCIA, ARGELIO FRANCISCO          §
ROBLES-GARCIA,                      §
            Plaintiffs,             §
                                    §
v.                                  §        CIVIL ACTION NO. 7:12-cv-17
                                    §
CHIP BERRY PRODUCE COMPANY,         §

1

JAY BIRD FARMS LTD, R.                §
ZAMORANO PRODUCE COMPANY,              §
RODOLFO ZAMORANO SR.,                  §
RODOLFO ZAMORANO JR.,                  §
    Defendants.                        §

## PLAINTIFFS' ORIGINAL COMPLAINT

### I. PRELIMINARY STATEMENT

1.1    This is a civil action for damages and declaratory relief brought by nine U.S. citizens or legal permanent residents (collectively referred to as "U.S. workers") from the Rio Grande valley, nine U.S. workers from West Texas, and twenty-two foreign H-2A visa workers against five agricultural employers as joint employer defendants utilizing the H-2A temporary agricultural worker program.

1.2    Claims stem from Defendants' employment practices during the 2009 and 2010 agricultural seasons. Plaintiffs' challenge to Defendants' employment practices is premised on violations of their federal statutory rights under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801, *et seq.*; the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*; and §1981 of the Civil Rights Act, 42 U.S.C. § 1981. Plaintiffs also bring state law claims for breach of contract.

### II. JURISDICTION AND VENUE

2.1    This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1331 as the claims turn on substantial questions of federal law; 29 U.S.C. § 1854(a) as claims based on violations of the AWPA; 29 U.S.C. § 216(b) as claims under the FLSA; 28 U.S.C. § 1337 as claims arising under acts of Congress regulating commerce; 28 U.S.C. § 1343(a)(4) as claims arising under federal civil rights laws; and 28 U.S.C. § 1367 as state law claims over which the Court may exercise supplemental jurisdiction.

2.2    Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

2.3    This Court has personal jurisdiction over all Defendants as individuals residing in Edinburg, Hidalgo County, Texas and businesses with principle places of business and doing business in Edinburg, Hidalgo County, Texas.

2.3    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), 29 U.S.C. § 1854(a), and 29 U.S.C. § 216(b).

### III. STATUTORY AND REGULATORY FRAMEWORK

3.1    The Immigration and Nationality Act and its implementing federal regulations govern the H-2A foreign guest worker program. 8 U.S.C. § 1188 (2006).[1]

3.2    Under the H-2A program, agricultural employers who meet certain requirements are permitted to hire H-2A workers[2] when they anticipate shortages of U.S. workers.[3] Before hiring foreign H-2A workers, employers must apply for certification by the U.S. Department of Labor ("DOL") that (1) there are not sufficient able, willing, and qualified U.S. workers available to perform the labor or services; and (2) employment of H-2A workers will not adversely affect the wages and working conditions of similarly employed U.S. workers. 8 U.S.C. § 1188(a)(1).

3.3    To participate in the program, an employer prepares a job offer with all necessary terms of employment as set forth in the applicable federal regulations. The necessary terms include the wage rate, housing and transportation arrangements, meal provisions, workweek hour

---

[1] Two versions of regulations administered by the U.S. Department of Labor apply to the claims in this petition. Regulations in effect from June 21, 2006 to January 17, 2009, apply to use of the H-2A program as approved by the DOL in January 2009. Revised regulations in effect from June 29, 2009 to March 10, 2010, apply to use of the H-2A program approved by the DOL in July 2009 and February 2010. For purposes of the claims in this complaint, the two sets of regulations are substantively indistinguishable.

[2] An H-2A worker is a non-immigrant alien admitted to the U.S., at the request of a U.S. employer, to perform agricultural labor or services of a temporary or seasonal nature. 8 U.S.C. § 1101(a)(15)(H)(ii)(a).

[3] A U.S. worker is a citizen or national of the U.S. or an alien lawfully admitted for permanent residence in the U.S. 20 C.F.R. § 655.103.

guarantee, and period of employment. The employer submits this job offer to the local State Workforce Agency, here the Texas Workforce Commission ("TWC"), which prepares a local job order. The job order is used to enable recruitment and potential hiring of U.S. workers, to which the employer must agree as a condition of DOL's approval of its application to hire H-2A workers.

3.4     The employer submits a copy of the job offer and an Application for Temporary Employment Certification to the DOL. After the DOL accepts the application for processing, the TWC job order is circulated in the interstate job clearance system and the employer engages in positive recruiting efforts, such as newspaper advertisements, to recruit U.S. workers.

3.5     When the DOL is satisfied that the employer has complied with all program requirements, the application package, called a Clearance Order, is approved. The DO grants temporary foreign agricultural labor certification that allows the appropriate number of foreign workers to obtain visas for the positions that U.S. workers did not fill. In absence of a separate, written work contract entered into between the employer and worker, the job order becomes the employment contract.

3.5A    The H-2A regulations require, among other things, employers to include, as terms of the employment contract with both H-2A workers and U.S. workers recruited and hired pursuant to Clearance Orders, an assurance that the wage rate at which workers will be paid will be the greatest of an hourly rate specified by regulation, called the Adverse Effect Wage Rate ("AEWR"), the prevailing wage rate, or the minimum federal or state hourly wage. The regulations also require employers to guarantee that workers will be paid for at least three-quarters of the total hours of the anticipated period of employment; and to pay for transportation and subsistence costs that workers incur in traveling to the work-site from the locations where

they had been recruited, and from the work-site back to places of recruitment at the end of the employment period.

3.6    The AWPA protects domestic migrant and seasonal agricultural workers by establishing employment standards related to wages, housing, transportation, disclosures, and recordkeeping. 29 U.S.C. §§ 1801, *et seq*. Congress passed the Act "to reverse the historical pattern of abuse" of migrant and seasonal agricultural workers. 1982 U.S.C.C.A.N. 4547. As a remedial statute to achieve this purpose, courts interpret its provisions broadly. *Castillo v. Case Farms of Ohio, Inc*., 96 F. Supp. 2d 578, 614 (W.D. Tex. 1999).

3.7    The FLSA regulates labor conditions in commerce related industries 29 U.S.C. §§ 201, *et seq*. It sets minimum employment standards necessary for the health, efficiency, and general well-being of workers. 29 U.S.C. § 202. Under the H-2A regulations, employers utilizing the H-2A program are required to comply with the FLSA and all other applicable federal, state, and local employment-related laws and regulations, including employment-related health and safety laws.

3.8    The provisions of 42 U.S.C. § 1981 prohibit discrimination against individuals on grounds of citizenship or alienage. Under § 1981, all persons within the jurisdiction of the United States enjoy equal rights to make and enforce contracts, including equal employment opportunities, regardless of race, citizenship, or alienage status.

## IV. PARTIES

**Plaintiffs**

4.1    Plaintiffs JOSEFINA ALICIA GUAJARDO, JOSE ALBERTO LARA, ROSA IDALIA RIOS, and GUADALUPE GARZA, (hereinafter referred to as "CITIZEN RIO PLAINTIFFS") are all U.S. citizens residing in Hidalgo County, Texas. JUAN MANUEL

RODRIGUEZ-MORALES, NOE LONGORIA, GUADALUPE LERMA, FRANCISCO VILLASANA, and JOSE LUIS VILLASANA, (hereinafter referred to collectively as "LPR RIO PLAINTIFFS") are all legal permanent residents residing in Hidalgo County, Texas. The members of both Rio Plaintiff groups (hereinafter be referred to collectively as "RIO GRANDE VALLEY PLAINTIFFS") were, at all times relevant to this action, migrant agricultural workers[4] and seasonal agricultural workers [5] as defined by the AWPA, U.S. workers under the H-2A program, and employees under the common law.

4.2     Plaintiffs ALAN LONGORIA, JEREMIA RAMOS, CHRISTOPHER LONGORIA, ALFREDO SOTO, FRANK FLORES III, PEDRO MARCOS HINOJOSA, RUBEN CASTILLO JR., ISRAEL MARTINEZ, and JESUS PUERTAS (hereinafter referred to collectively as "WEST TEXAS PLAINTIFFS") are all U.S. citizens residing in Texas. Plaintiffs were, at all times relevant to this action, seasonal agricultural workers as defined by the AWPA, U.S. workers under the H-2A program, and employees under the common law.

4.3     Plaintiffs JOSE MONSERRATO RIVERA-LOZOYA, GUADALUPE SANTOS RIVERA-LOZOYA, SANTOS GUADALUPE RIVERA-LOZOYA, HOMERO GUADALUPE RIVERA-FLORES, DOROTEO MOYA-GARCIA, JUAN RUPERTO MORENO-FUENTES, JUAN GABRIEL MENDOZA-RODRIGUEZ, JOSE RAUL GONZALEZ-RODRIGUEZ, JOSE ERASMO GONZALEZ-RODRIGUEZ, ABDIEL ELISEO GARZA-RIVERA, RICARDO FUENTES-BORREGO, JOSE ARJELIO FUENTES-BORREGO, MIGUEL ANGEL ESPINOZA-SANCHEZ, WVENCE CAMARILLO-VEGA, JUAN JOSE CAMARILLO-

---

[4] The term "migrant agricultural worker" means an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence. 29 U.S.C. § 1802(10)(A).
[5] The term "seasonal agricultural worker" means an individual who is employed in agricultural employment of a seasonal or other temporary nature and is not required to be absent overnight from his permanent place of residence. 29 U.S.C. § 1802(10)(A).

LOPEZ, LIZANDRO CAMARILLO-VEGA, ELISEO BORREGO-GARZA, ROBERTO SANCHEZ-TREVINO, JUAN ALEJO VILLEGAS-SANCHEZ, CARLOS ANTONIO VILLEGAS-SANCHEZ, ADRIAN CASIMIRO RODRIGUEZ-GARCIA, and ARGELIO FRANCISCO ROBLES-GARCIA (hereinafter collectively referred to as "H-2A PLAINTIFFS") are all citizens of Mexico whose permanent places of residence are in Mexico. Plaintiffs were H-2A workers legally admitted to work in the U.S. under temporary work visas and employees under the common law at all times relevant to this action.

**Defendants**

4.4     Defendant RODOLFO ZAMORANO, SR. (hereinafter "ZAMORANO") is a natural person and a registered farm labor contractor residing in Hidalgo County, Texas. He may served at his residence at 921 S. 19TH Ave., Edinburg, TX 78539.

4.5     Defendant RODOLFO ZAMORANO, JR. (hereinafter "JUNIOR") is a natural person and a registered farm labor contractor residing in Hidalgo County, Texas. He may be served at his residence at 1543 North Alamo Road, Alamo, TX 78516.

4.6     R. ZAMORANO PRODUCE COMPANY (hereinafter "RZP") is a company doing business in the State of Texas as a farm labor contractor[6]. RZP may be served with process through the owner, Rodolfo Zamorano, Sr. at the business headquarters and his residence at 921 S. 19TH Ave., Edinburg, TX 78539.

4.7     CHIP BERRY PRODUCE COMPANY (hereinafter "CHIP BERRY") is a Texas corporation doing business in Texas and is an agricultural employer within the definition as

---

[6] The term "farm labor contractor" means any person, other than an agricultural employer, an agricultural association, or an employee of an agricultural employer or agricultural association, who, for any money or other valuable consideration paid or promised to be paid, performs any farm labor contracting activity. 29 U.S.C. § 1802(7).

stated in the AWPA and INA. It may be served with process by serving its registered agent Ferrel "Chip" M. Berry at PO Box 688, Flint, TX 75762.

4.8    JAY BIRD FARMS, LTD. (hereinafter "JAY BIRD") is a Texas corporation doing business in Texas and is an agricultural employer within the definition as stated in the AWPA and INA. It may be served with process by serving its registered agent, Forest Jay Nichols, at 113 East Shasta Avenue, McAllen, TX 78504.

**V. STATEMENT OF FACTS**

5.1    Plaintiffs re-allege and incorporate by reference Paragraphs 1.1-4.8 of this complaint.

**Facts Relevant to the Employers' Relationships**

5.2    Jay Bird and Chip Berry are vertically integrated agricultural producers of watermelons. In 2009 and 2010, Jay Bird and Chip Berry grew, harvested, marketed, and shipped in interstate commerce thousands of acres worth of watermelons.

5.3    Jay Bird and Chip Berry engaged RZP as a farm labor contractor to recruit and hire workers to pack watermelons at their facilities during the 2009 and 2010 agricultural seasons.

5.4    At all times relevant to this complaint, Jay Bird and RZP jointly employed the workers that RZP provided to Jay Bird, and Chip Berry and RZP jointly employed the workers that RZP provided to Chip Berry. *See* 29 C.F.R. § 791.2 and 29 C.F.R. § 500.20(h) (setting forth some, but not all, of the factors courts may use to determine joint employment under the economic reality test).

5.5    Jay Bird and Chip Berry had significant direct and indirect control as to the manner in which the Plaintiffs performed their jobs. Directly, the producers maintained full

control of the watermelon packing sheds and oversaw the workers' job performances while managing the packing process. Indirectly, each producer's direct employees at its packing facilities routinely gave operational instructions to Zamorano and Junior, who in turn communicated the instructions to Plaintiffs.

5.6     Both Jay Bird and Chip Berry had the power to fire Plaintiffs and modify the employment conditions of the workers. The producers could modify the workers' employment conditions because they controlled the packing sheds and equipment, they managed the hours the packing shed operated, they could dictate the job assignments Plaintiffs received, and they could reassign Plaintiffs to work at any of their respective facilities or job-sites.

5.7     The services rendered by Plaintiffs were repetitive, rote tasks such as taking watermelons from a conveyer belt and packing them for shipment. The job requirements for these services were minimal and the skills were acquired with very little training.

5.8     The duration of the relationship between Jay Bird, Chip Berry, and Plaintiffs in the context of the agricultural activity was significant. At least sixteen of the twenty-two H-2A Plaintiff workers worked for the producers for two consecutive years. Both years, the employment period, although cut short in practice, was for ten out of the twelve months of the year and spanned three different harvests of watermelon.

5.9     The relationship between Plaintiffs and the producers for whom they worked was also exclusive. Plaintiffs did not shift as a unit from one work site to another. At times when there was no work at the Chip Berry and Jay Bird facilities, Plaintiffs did not perform work anywhere else.

5.10    Jay Bird and Chip Berry each owned and controlled their respective packing facilities where Plaintiffs worked.

5.11    Plaintiffs were economically dependant on Jay Bird and Chip Berry as their sole work providers. Among other things, Plaintiffs relied upon the producers for access to the work-site, as suppliers of the watermelons handled at the work-site, and as suppliers of equipment and tools necessary to complete the work.

5.12    The activities Plaintiffs performed were an integral part of the producers' business. Jay Bird stated in its contract with RZP that the watermelon "acreage is planted, harvested, and marketed by Jay Bird Farms." The home page for the Chip Berry Produce website states that it "is a Grower, Shipper and Packer" of watermelons. The producers would not have been able to ship or market their watermelons without the packing services that Plaintiffs provided. Plaintiffs' labor thus played an integral, not incidental, role, in the producers' overall business operations.

5.13    Under the FLSA and AWPA, the term employ includes "to suffer or permit to work." 29 U.S.C. § 203(g), 29 U.S.C. § 1802(5). Both Jay Bird and Chip Berry suffered or permitted Plaintiffs to work at their respective packing facilities.

**Facts Relevant to Rio Grande Valley Plaintiffs**

5.14    In 2010, RIO GRANDE VALLEY PLAINTIFFS accepted Defendants' job offers for agricultural employment. All were able, willing, and qualified candidates available for the employment offered, that is, packing watermelons at Jay Bird and Chip Berry facilities in Hidalgo County and Gaines County, Texas.

5.15    Defendants violated their legal obligation to provide employment to preferred U.S. workers by failing to hire Plaintiffs and instead hiring foreign H-2A workers.

5.16    In December of 2009, RZP at the behest of Jay Bird and Chip Berry applied for certification under the H-2A program to hire sixty H-2A workers to work in watermelon

packing. The application was rejected due to a mistake, but after a modified application was submitted, DOL certified the Clearance Order on February 19, 2010.

5.17    After certification, the TWC circulated job order TX6765304 for the RZP job offer included in the application. Recruiting commenced pursuant to the job order.

5.18    The terms of the job offer were as follows:

      a)    Employment from February 15, 2010 to November 30, 2010;

      b)    Forty hours of work per week;

      c)    Wage rate at the 2009 adverse effect wage rate (AEWR) of $9.27, to increase to the 2010 AEWR upon its effective date.

5.19    The job requirements included the ability to load, unload, and pack watermelons; one-month experience; and willingness to take a drug test paid for by the employer.

5.20    Workforce Solutions, out of Weslaco, Texas referred several of the Rio Grande Valley Plaintiffs to the job order, which was circulated in the interstate clearance system. Plaintiffs applied for employment with Defendants on various dates between February 29, 2010 and March 10, 2010.

5.21    Plaintiff Jose Alberto Lara went to RZP to accept the employment as stipulated in the job order. He was ready and available for work.

5.22    Zamorano asked Lara if he was a citizen, to which he replied that he was a U.S. Citizen. Zamorano stated that the work was hard, including unloading produce from a conveyer belt. Lara expressed that he still wanted the job and Zamorano told him that he would receive a call in seven to eight days.

5.23    Lara never received a call after the interview with Zamorano and he was not hired, despite his preferred status as a U.S. worker by virtue of his status as a U.S. Citizen.

5.24    Plaintiff Guadalupe Lerma went to Zamorano to accept employment pursuant to the job offer made by Defendants. He was ready and available for work.

5.25    During his interview, he was asked about previous work experience and Lerma stated that he had done the type of work before. Zamorano stated that the work was hard and he would have to see if Lerma qualified for employment. Lerma was told to expect a call within eight days.

5.26    Lerma never received a call after the interview with RZP and he was not hired, despite his preferred status as a US worker.

5.27    Plaintiff Noe Longoria went to RZP to accept employment pursuant to the job offer made by Defendants. He was ready and available for work.

5.28    When he was interviewed by Zamorano, he was asked who referred him, whether he had a criminal background, and his age. Zamorano stated that the work was hard and he would have to see if Longoria qualified for employment. Longoria was told to expect a call in eight days.

5.29     Longoria did not receive a call and was not hired, despite Plaintiff's preferred status as a U.S. worker.

5.30    Plaintiff Juan Manuel Rodriguez-Morales went to RZP to accept employment pursuant to the job offer made by Defendants. He was ready and available for work.

5.31    Zamorano inquired to Rodriguez-Morales whether he had any experience in watermelon packing. Zamorano told Morales that the job would not be to his liking and thus would not be worth his trouble. Rodriguez-Morales insisted that he wanted the job.

5.32    Rodriguez-Morales did not receive a call and was not hired, despite Plaintiff's preferred status as a U.S. worker.

5.33    Father and son Plaintiffs Jose Luis Villasana and Francisco Villasana went to RZP to accept employment pursuant to the job offers made by Defendants. They were ready and available for work.

5.34    Jose Villasana observed that Zamorano appeared as if he did not want to hire them. He told Plaintiffs that he would call them in eight days to inform them if they would be hired.

5.35    Zamorano never called Plaintiffs and they were not hired, despite their preferred status as U.S. workers.

5.36    Plaintiff Guadalupe Garza went to RZP to accept employment pursuant to the job offer made by Defendants. He was ready and available for work.

5.37    Zamorano asked about any criminal background and whether Plaintiff had documents regarding his citizenship status. He asked about previous work experience and Garza replied that he had packing shed experience. Zamorano stated that it was not to his advantage to hire someone at the $9.27 wage rate when he could pay less to someone else. Zamorano stated he would call Plaintiff about employment.

5.38    Garza did not receive a call and was not hired, despite his preferred status as a U.S. worker by virtue of his status as a U.S. Citizen.

5.39    Plaintiff Josefina Alicia Guajardo went to RZP to accept employment pursuant to the job offer made by Defendants. She was ready and available for work.

5.40    While speaking with Zamorano, he stated that he was not interested in hiring women. Zamorano indicated he preferred to hire men because the work was "probably too heavy" for women.

5.41    Guajardo did not receive a call and was not hired, despite Plaintiff's preferred status as a U.S. worker by virtue of her status as a U.S. Citizen.

5.42    Plaintiff Rosa Idalia Rios called RZP to accept employment pursuant to the job offer made by Defendants. Plaintiff told Zamorano that she had been instructed to report to the packing shed by noon to apply. She was ready and available for work.

5.43    Zamorano informed Rios that he did not want to hire women. Rios was not hired despite Plaintiff's preferred status as a U.S. worker by virtue of her status as a U.S. Citizen.

5.44    By applying and receiving certification for foreign H-2A workers, RZP agreed to abide by all H-2A program regulations, including an assurance that there were insufficient able, willing, and qualified U.S. workers available to fill the positions.

5.45    Despite this assurance, RZP failed to hire any of the nine RIO GRANDE VALLEY PLAINTIFFS, each of whom had preferred status as a U.S. worker and was an able, willing, and qualified job candidate available to fill the positions offered. RZP displaced these U.S. workers by hiring H-2A workers for the 2010 season.

**Facts Relevant to U.S. Workers from West Texas**

5.46    In 2009, Defendants hired WEST TEXAS PLAINTIFFS for agricultural employment. Defendants failed to comply with the H-2A program requirements with respect to these Plaintiffs, and committed violations of, Plaintiffs' rights under other employment related laws.

5.47    On or around June 29, 2009 RZP at behest of Jay Bird and Chip Berry applied for labor certification for fifteen temporary foreign workers. The DOL granted certification on July 10, 2009.

5.48    The corresponding TWC job order TX6102053 called for "farmworkers and laborers to pack watermelons." The terms of employment were as follows:

      a)      Wage rate at the AEWR of $9.27 per hour;

      b)      Forty-eight hour workweeks;

      c)      Guaranteed compensation for at least three-quarters of the total hours of the anticipated period of employment;

      d)      No-cost meals provided by the employer.

5.49    On various dates between July and August of 2009, RZP hired WEST TEXAS PLAINTIFFS, all U.S. citizen workers, pursuant to the June 29, 2009, job order TX6102053.

5.50    On or around July 16, 2009, RZP hired Alfredo Soto, Christopher Longoria, Jeremia Ramos, and Alan Longoria.

5.51    On or around July 20, 2009, RZP hired Jesus Puertas, Israel Martinez, Ruben Castillo Jr., and Pedro Hinojosa.

5.52    On or around August 8, 2009, RZP hired Frank Flores III.

5.53    Each Plaintiff began working the day he was hired, with the understanding that the same terms of employment were effective on the day of hire.

5.54    On or around August 10, 2009, an additional fifteen workers arrived at Chip Berry's packing shed in Brownfield. All were foreign H-2A visa workers that DOL allowed to be hired on the basis of representations that there were insufficient U.S. workers willing, able, and available to perform the work.

5.55    RZP at the behest of Defendants had hired the additional H-2A workers to work at a Chip Berry Produce packing shed in Brownfield. However, Defendants instead sent twelve of the fifteen new H-2A workers to Seminole to work and live with the Jay Bird packing crew. Due

to this change, Defendants then reassigned a number of Jay Bird's Seminole workers to the Chip Berry facility in Brownfield.

5.56    On or about August 15, 2009 WEST TEXAS PLAINTIFFS Pedro Hinojosa and Frank Flores III arrived to work as instructed. They waited until lunch, 12:00 p.m., but had not been assigned any work. They took a ride to Brownfield for the lunch hour. Their ride informed them that he would not be returning to the packing shed, at which point they tried to call Zamorano. He did not answer.

5.57    When Plaintiffs Hinojosa and Flores reached Zamorano by telephone the following working day, Monday, August 17, 2009, Zamorano informed them that they had been replaced and terminated them.

5.58    On or about August 19, 2009 Plaintiff Jesus Puertas made a request to a supervisor to be provided with full time hours as stipulated in the employment contract. The supervisor informed Zamorano, who reprimanded Puertas and instructed him not to talk to other workers about hours. Puertas was then reassigned to clean rotten and maggot-infested watermelons without protective gear. Upon information and belief, Puertas' reassignment was in retaliation for his request for full time hours.

5.59    Zamorano was aware that WEST TEXAS PLAINTIFFS Ruben Castillo, Jr. and Israel Martinez supported Puertas in requesting the contractually agreed to number of hours. A supervisor told Castillo and Martinez that if they wanted more hours, they would have to work more assignment after the other workers left.

5.60    Zamorano instructed Puertas, Castillo, and Martinez to stay for additional work after everyone else was ordered home for the evening. Before the three men left for the evening,

Zamorano threatened to fire Castillo if he arrived more than ten minutes late to work the next day.

5.61    The next day, August 20, 2009 Zamorano fired Castillo, purportedly because he arrived four minutes late to work. At the time Castillo arrived no one was working.

5.62    Later that same morning, all workers were instructed to take a break except Puertas and Martinez, who were told to chop weeds. Puertas and Martinez left to cut weeds, but on a break, both called the TWC office to inform representatives about the treatment they had been receiving.

5.63    Supervisors at the behest of Defendants fired both Plaintiffs, Puertas and Martinez, after learning of the phone calls to the TWC. Upon information and belief, they were fired in retaliation for their calls to the TWC.

5.64    WEST TEXAS PLAINTIFFS Alfredo Soto, Christopher Longoria, Jeremia Ramos, and Alan Longoria had all been forced to leave employment by the end of August because they were not provided sufficient work hours.

5.65    TWC sent several other U.S. worker referrals to RZP, but most of them left within days of employment. Upon information and belief, these TWC referred workers left due to insufficient work hours. WEST TEXAS PLAINTIFFS noted that several other crews, generally those made up of H-2A visa workers, would arrive early and work late while the TWC referred workers often waited for hours before getting any paid hours of work.

5.66    Defendants failed to provide WEST TEXAS PLAINTIFFS with no-cost meals. When Plaintiffs requested the meals, Defendants stated that the employer-provided meal agreement only applied to the H-2A visa workers.

5.67    Defendants willfully failed to fully compensate Plaintiffs for total hours worked. Each evening RZP at the behest of Chip Berry told Plaintiffs the starting hour for work the following day. Each morning after WEST TEXAS PLAINTIFFS arrived for work at the stated time at the Chip Berry facilities, they would spend numerous hours waiting for an assignment. Defendants willfully failed to compensate Plaintiffs for the time that they required Plaintiffs to wait for work to begin.

5.68    Defendants failed to pay Plaintiffs the federal minimum wage or the adverse effect wage rate for all of the hours that they worked by failing to record the waiting times as paid working hours that were primarily for the benefit of Defendants.

5.69    On or about August 10, 2009, Defendants fired the Plaintiffs without cause and without payment for all hours worked. At or about the same time, Defendants brought additional H-2A visa workers to the Chip Berry and Jay Bird facilities to replace the Plaintiffs who they had fired.

**Facts Relevant to H-2A Visa Workers**

5.70    In 2009 and 2010, Defendants hired H-2A PLAINTIFFS for agricultural employment. Defendants violated Plaintiffs' rights in both years.

### **2009 Season**

5.71    Jay Bird and Chip Berry contracted with RZP to arrange for agricultural workers to pack watermelons at each of their respective packing sheds for the 2009 agricultural season.

5.72    Claiming an anticipated shortage of U.S. workers, RZP at the behest of Jay Bird and Chip Berry applied for foreign labor certification in order to hire H-2A visa workers for the season. On January 15, 2009, RZP was granted temporary foreign agricultural labor certification for forty-five workers.

5.73    The job order called for an anticipated period of employment from February 15, 2009 to November 30, 2009. Terms of employment were as follows:

a)      Wage rate of $9.02 per hour;

b)      Forty-eight hour workweeks;

c)      Guaranteed compensation for at least three-quarters of the total hours of the anticipated employment;

d)      Three no-cost meals per day provided by the employer;

e)      Reimbursement for in-bound transportation and subsistence costs after fifty percent of the work contract was completed;

f)      After completion of the contract, the employer would pay for the cost of return transportation.

5.74    RZP sent agent and H-2A employee Aristeo Martinez to Mexico to coordinate recruitment, help workers obtain work visas, and arrange transportation of the foreign workers. RZP hired sixteen of the H-2A PLAINTIFFS group for the 2009 season. Each of these Plaintiffs paid a mandatory two-hundred peso recruitment fee to Martinez.

5.75    The visas were for eight months, March 18, 2009 to November 30, 2009 and were issued in Nuevo Laredo, Tamaulipas, Mexico.

5.76    The sixteen H-2A PLAINTIFFS entered the United States on March 18, 2009, as indicated on their passports. They travelled from Mexico to Edinburg, Texas at their own expense. Defendants failed to reimburse Plaintiffs for these inbound transportation expenses.

5.77    Defendant RZP employed these sixteen Plaintiffs in Edinburg, Texas for less than two weeks harvesting onions in the fields. Plaintiffs did not work everyday of this period and were paid by piece rate, instead of the disclosed AEWR of $9.02 per hour.

5.78    On or about April 4, 2009, RZP told Plaintiffs to return to Mexico due to lack of available work. Defendants did not pay for Plaintiffs' return transportation expenses. Plaintiffs

were forced to use what little money they had earned, without reimbursement, to pay for their return transportation to Mexico.

5.79   On or about April 18, 2009, RZP at the behest of Jay Bird and Chip Berry instructed the H-2A PLAINTIFFS to return to work in the Edinburg area. Plaintiffs paid for their own transportation expenses travelling from Mexico to Edinburg, and again they were not reimbursed for these expenses. After they returned and until late June 2009, Plaintiffs worked packing watermelons at the Chip Berry and Jay Bird packing sheds. Over this period, Defendants provided Plaintiffs with forty hours or less of work each week.

5.80   H-2A PLAINTIFFS were hired pursuant to job orders stating that the workers would live in five mobile homes and ten double occupancy hotel rooms. Contrary to these representations, Plaintiffs and other H-2A visa workers, around sixty men in total, were all housed in five mobile homes, in violation of applicable housing standards.

5.81   H-2A PLAINTIFFS thereafter only worked for approximately eight weeks, until the third week of June, at which point RZP at the behest of Jay Bird and Chip Berry again sent them back to Mexico, each at his own expense.

5.82   On or about July 6, 2009, H-2A PLAINTIFFS again paid for in-bound travel expenses, without reimbursement, to Texas. Approximately half the workers went to work at a Jay Bird packing shed in Seminole, Texas, and the others went to work at a Chip Berry packing shed in Brownfield, Texas.

5.83   In Seminole, RZP housed approximately forty workers in two mobile homes adjacent to the work site. At one point, RZP moved the workers to the Relax Inn in Hobbs, New Mexico for one week to avoid an anticipated housing inspection.

5.84   In Brownfield, the workers stayed at an Economy Inn.

5.85    Despite the H-2A PLAINTFFS working more than forty-hours in a workweek during several of the workweeks between July and September, Defendants willfully failed to pay them overtime wages.

5.86    H-2A PLAINTIFFS were working towards the contract expiration date of November 30, 2009, but during the third week of September RZP at behest of Jay Bird and Chip Berry terminated all work and sent Plaintiffs home to Mexico. Plaintiffs returned to Mexico at their own expense and were never reimbursed by Defendants.

5.87    At no point during Plaintiffs' employment did Defendants provide three no-cost meals per day. All Plaintiffs paid for their own food, and prepared it.

5.88    Defendants did not employ or compensate Plaintiffs for at least the three-fourths guarantee of hours as set forth in the employment contract.

**2010 Season**

5.89    RZP agent Aristeo Martinez began recruiting for the 2010 season as early as November of 2009. He demanded a five-hundred peso recruitment fee, which several H-2A PLAINTIFFS paid.

5.90    Martinez also collected some of the workers' passports. Martinez collected the passports of Plaintiffs Eliseo Borrego-Garza and Jose Argelio Fuentes-Borrego for the 2010 season, but RZP did not hire them.

5.91    RZP at behest of Jay Bird and Chip Berry had submitted the job offer calling for hand packers with the TWC office, which created job order TX6765304 dated February 23, 2010, the same job order for which RZP failed to employ RIO GRANDE VALLEY PLAINTIFFS.

5.92    RZP represented in the job order that the anticipated period of employment would run from February 15, 2010 to November 30, 2010. Terms of employment were as follows:

    a)    Forty hours of work per week;

    b)    Wage rate at the 2009 adverse effect wage rate of $9.27, to increase to the 2010 rate upon its effective date;

    c)    Free and convenient cooking facilities and transportation to stores where workers could purchase groceries;

    d)    Reimbursement for in-bound transportation and subsistence costs after fifty percent of the work contract was completed;

    e)    After completion of the contract, the employer would pay for the cost of return transportation and subsistence.

5.93    On April 18, 2010 H-2A PLAINTIFFS were issued visas in Nuevo Laredo. Sanchez-Trevino's processing was delayed and he was issued a visa on May 20, 2010, also in Nuevo Laredo. In total, forty men including H-2A PLAINTIFFS received visas.

5.94    Each member of H-2A PLAINTIFFS had in-bound transportation expenses of approximately five-thousand pesos for which they were never reimbursed.

5.95    Plaintiffs had arrived in Edinburg, Texas, to do watermelon packing but there was no available work so they spent the first five days harvesting onions in the fields. The work was done on a piece rate basis.

5.96    Several H-2A PLAINTIFFS were approached by inspectors while working in the fields about any problems or complaints they may be having on the job. No one responded for fear of retaliation. Subsequently Zamorano informed the group he needed to pay them overtime wages for any overtime hours.

5.97    After working in the fields, for the remainder of the work period Plaintiffs packed watermelons in the Chip Berry and Jay Bird packing sheds in or around Edinburg.

5.98    On or around the third week in June of 2010 H-2A PLAINTIFFS were told they had to return to Mexico. They did so, each at his own expense and without reimbursement.

5.99    On or around July 11, 2010 Plaintiffs were told to report back and they were transported to Seminole, Texas area to work at the Jay Bird shed. Plaintiffs returned at their own expense. Work in July was sporadic. In August and September, it was less so, and they sometimes worked forty hours or more per week but often it was less.

5.100   H-2A PLAINTIFFS in Seminole were housed in a metal building with no windows. The building had only three entrances and large fans were placed inside to circulate the hot air.

5.101   When the season ended, H-2A PLAINTIFFS had not worked or been compensated for three-quarters of the guaranteed hours, nor were they paid the cost of return transportation and subsistence from the place of work to the point of recruitment upon completion of the contract.

## VI. CAUSES OF ACTION

**FIRST CAUSE OF ACTION: AWPA**

6.1    Plaintiffs re-allege and incorporate by reference paragraphs 1.1 – 5.101 of this complaint.

6.2    Defendants intentionally violated the rights of the RIO GRANDE VALLEY PLAINTIFFS under AWPA by:

a)    Knowingly providing false or misleading information about the terms, conditions, or existence of agricultural employment contrary to 29 U.S.C. § 1821(f) and 29 U.S.C. § 1831(e); and

b)     Violating the terms of the working arrangement by failing to provide

Plaintiffs with employment contrary to 29 U.S.C. § 1822(c) and 29 U.S.C.

§ 1832(c); and the assurances set forth in the job order which state that: (i)

the job opportunity is open to any qualified U.S. worker and rejections of

U.S. workers will only be for lawful, job-related reasons and (ii) that the

employer has and will continue to cooperate with the TWC by accepting

referrals of all eligible U.S. workers who apply for the job opportunity

from the time the foreign workers depart for the employer's place of

employment until 50 percent of the period of work contract has elapsed.

20 C.F.R. § 655.103(c) and (e).

6.3     Defendants intentionally violated the rights of the WEST TEXAS PLAINTIFFS

under the AWPA by:

a)     Failing to place a poster in the place of employment setting forth the Plaintiffs'

rights as seasonal agricultural workers as required by 29 U.S.C. § 1831(b);

b)     Knowingly providing false or misleading information to Plaintiffs concerning the

terms, conditions, or existence of agricultural employment contrary to 29 U.S.C. §

1831(e);

c)     Failing to pay the wages owed to Plaintiffs when due by not paying Plaintiffs for

waiting times after Plaintiffs arrived to work at the appointed starting hour for the

primary benefit of Defendants contrary to 29 U.S.C. § 1832(a); and

d)     Violating the terms of the working agreement with Plaintiffs without justification

by, amongst other things, failing to provide meals, failing to provide sufficient

hours of work, firing Plaintiffs without cause, and displacing Plaintiffs with

foreign H-2A workers contrary to 29 U.S.C. § 1832(c) and the assurances set forth under 20 C.F.R. § 655.103(b), (c), (d), and (e).

6.4     Defendants intentionally violated the rights of the JESUS PUERTAS, RUBEN CASTILLO, and ISRAEL MARTINEZ under the AWPA by:

a)     Intimidating, threatening, discharging, or in some manner discriminating against Plaintiffs for the exercise, with just cause, of any right or protection afforded by the AWPA by warning them not to discuss the lack of work hours, giving them assignments after other workers left, and terminating Plaintiffs for reporting their treatment to the TWC in violation of 29 U.S.C. § 1855(a), and the assurance contained in the job offer   pursuant to 20 C.F.R. § 655.103(g) (retaliation prohibition).

6.5     Plaintiffs are entitled to recover from each Defendant for each violation their actual damages, or statutory damages of up to $500.00 per person, whichever is greater, together with injunctive and other equitable relief.

**SECOND CAUSE OF ACTION: FLSA**

6.6     Plaintiffs re-allege and incorporate by reference paragraphs 1.1 – 5.101 of this complaint.

6.7     Defendants employed WEST TEXAS PLAINTIFFS within the meaning of employ under the FLSA. In addition, Defendants, as employers utilizing and availing themselves to the H-2A program, were bound by all program regulations. One such regulation, 20 C.F.R. § 655.105(e)(1), requires compliance with all applicable federal, state, and local employment-related laws and regulations, including health and safety laws. The FLSA is one such applicable act, which Defendants violated by:

a)       Willfully failing to pay at least the federal minimum wage by failing to pay Plaintiffs for time Defendants engaged the Plaintiff to wait for work to begin, contrary to 29 U.S.C. § 206.

6.8     WEST TEXAS PLAINTIFFS suffered damages in the form of lost wages as a result of Defendants' conduct.

6.9     Defendants are liable to WEST TEXAS PLAINTIFFS in the amount of their unpaid minimum wages and an additional equal amount as liquidated damages. 29 U.S.C. § 216. Plaintiffs are entitled to reasonable attorney fees and the cost of the suit. § 216.

6.10    In 2009 and 2010, H-2A PLAINTIFFS were employed by Defendants within the meaning of employ in the FLSA[7]. In addition, Defendants, as employers utilizing and availing themselves to the H-2A program, were bound by all program regulations. One of those regulations, 20 C.F.R. § 655.105(e)(1) requires compliance with all applicable federal, state, and local employment-related laws and regulations, including health and safety laws. The FLSA is one such applicable act, which Defendants violated provisions of by:

a)       Willfully failing to pay Plaintiffs overtime compensation of one and half times the normal pay-rate for weeks where the hours worked exceeded forty in violation of 29 U.S.C. § 207; and

b)       Willfully failing to pay Plaintiffs at least minimum wage for the first week of work by failing to reimburse Plaintiffs for the costs of travel and subsistence and recruitment and visa fees, all of which were for the primary benefit of Defendants, in violation of 29 U.S.C. § 206.

---

[7] "[I]t is well established that the protections of the Fair Labor Standards Act are applicable to citizens and aliens alike." In re Reyes, 814 F.2d 168, 170 (5th Cir. 1987).

6.11    H-2A PLAINTFFS suffered damages in the form of lost wages as a result of Defendants' conduct.

6.12    Defendants are liable to H-2A PLAINTIFFS in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. 29 U.S.C. § 216. Plaintiffs are also entitled to reasonable attorney fees and the cost of the suit. § 216.

**THIRD CAUSE OF ACTION- BREACH OF CONTRACT**

6.13    Plaintiffs re-allege and incorporate by reference paragraphs 1.1 – 5.101 of this complaint.

6.14    Defendants made valid offers of employment to RIO GRANDE VALLEY PLAINTIFFS by submitting job offers that the Plaintiffs accepted by reporting for employment. At the time of acceptance, Plaintiffs were prepared to perform their obligations under the contract.

6.15    Defendants unlawfully breached the employment contract by failing to comply with the H-2A programs requirements by not fulfilling its legal obligation under the contract to provide employment.

6.16    As a direct consequence of Defendants' breach, RIO GRANDE VALLEY PLAINTIFFS suffered economic losses from lost income.

6.17    Defendants are liable to RIO GRANDE VALLEY PLAINTIFFS for their actual, incidental, and consequential damages. Plaintiffs are also entitled to recover reasonable attorney fees. Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001, *et seq*.

6.18    Defendants entered into employment contracts with WEST TEXAS PLAINTIFFS by hiring Plaintiffs for the positions offered. Plaintiffs accepted the terms and conditions offered

by the Defendants as listed in the job order, which became the employment contract between Defendants and Plaintiffs.

6.19    WEST TEXAS PLAINTIFFS fulfilled their obligations under their contracts by appearing for work each day at the appointed hour and completing job assignments as instructed. Plaintiffs fully performed all obligations under the contracts until Defendants terminated them.

6.20    Defendants did not fulfill their obligations under the contract by failing to pay WEST TEXAS PLAINTIFFS at the AEWR; failing to comply with the three-fourths hour guarantee; failing to comply with employee related health and safety laws; terminating Plaintiffs for reasons other than lawful, job-related reasons; practicing unfair treatment by threatening and discharging Plaintiffs for asserting their rights.

6.21    Defendants' failure to fulfill their contractual obligations and unlawful terminations of WEST TEXAS PLAINTIFFS constituted unilateral breach by the Defendants of the employment contracts with the Plaintiffs.

6.22    Due to Defendants' breach, WEST TEXAS PLAINTIFFS suffered injury, including, but not limited to, lost income. Defendants are liable to Plaintiffs for their actual, incidental, and consequential damages. Plaintiffs are also entitled to recover reasonable attorney fees pursuant to Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001, *et seq*.

6.23    The Defendants entered into employment contracts with H-2A PLAINTIFFS by hiring Plaintiffs for the positions as set forth in the H-2A job order. Plaintiffs accepted the terms and conditions offered by the Defendants as listed in the job order, which became the employment contract between Defendants and Plaintiffs.

6.24     H-2A PLAINTIFFS fulfilled their obligations under their contracts by appearing for work each day at the appointed hour and completing job assignments as instructed. Plaintiffs fully performed all obligations under the contracts until Defendants terminated them.

6.25     Defendants did not fulfill their contractual obligations to H-2A PLAINTIFFS by failing to pay overtime as promised; failing comply with minimum housing standards; failing to provide meals or convenient kitchen facilities; failing three times to reimburse Plaintiffs for in-bound transportation and subsistence costs; failing three times to pay Plaintiffs out-bound transportation and subsistence costs; failing to comply with the three-fourths hour guarantee; failing to provide Plaintiffs with a copy of the work contract; failing to comply with employment related health and safety laws; failing to provide full time employment; and improperly collecting and failing to reimburse recruitment fees.

6.26     Defendants' failure to comply with the employment terms and unlawful termination of H-2A PLAINTIFFS  constituted unilateral breach by the Defendants of the employment contracts with the Plaintiffs.

6.27     Due to Defendants' breach of contract, H-2A PLAINTIFFS suffered injury, including lost income. Defendants are liable to Plaintiffs for actual, incidental, and consequential damages. Plaintiffs are also entitled to recover reasonable attorney fees pursuant to Tex. Civ. Prac. & Rem. Code Ann. §§ 38.001, *et seq*.

**FOURTH CAUSE OF ACTION: 42 U.S.C. SECTION 1981**

6.28     Plaintiffs re-allege and incorporate by reference paragraphs 1.1 – 5.101 of this complaint.

6.29     The actions of Defendants described in this complaint constitute intentional and purposeful discrimination against CITIZEN RIO PLAINTIFFS as U.S. citizens in favor of foreign H-2A workers with respect to the right to make and enforce contracts with Defendants.

6.30     Plaintiffs are entitled to recover their actual, compensatory, and punitive damages; costs of court; and attorney's fees pursuant to 42 U.S.C. §§ 1981 and 1988 (Civil Rights Act).

## VII. PRAYER FOR RELIEF

7.1     WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Court:

7.2     Enter a declaratory judgment that Defendants: violated the rights of RIO GRANDE VALLEY PLAINTIFFS and WEST TEXAS PLAINTIFFS under the AWPA as set forth in paragraphs 6.1 to 6.4; violated the rights of WEST TEXAS PLAINTIFFS and H-2A PLAINTIFFS under the FLSA as set forth in Paragraphs 6.6-6.12; breached their contracts with the Plaintiffs as set forth in paragraphs 6.13 to 6.27; and violated the rights of CITIZEN RIO PLAINTIFFS under 42 U.S.C. § 1981 as set forth in paragraph 6.28 to 6.30;

7.3     Award RIO GRANDE VALLEY and WEST TEXAS PLAINTIFFS actual damages or, alternatively, statutory damages in the amount of $500.00 for each violation of the AWPA per Plaintiff;

7.4     Award the WEST TEXAS and H-2A PLAINTIFFS each their unpaid minimum and/or overtime wages, as appropriate, plus an equal amount in liquidated damages;

7.5     Award Plaintiffs their actual, incidental, and consequential damages resulting from Defendants breaches of contracts;

7.6     Award CITIZEN RIO PLAINTIFFS their actual, compensatory, and punitive damages for violations of their rights under 42 U.S.C. § 1981;

7.7     Award Plaintiffs reasonable attorney's fees and court costs;

7.8     Award Plaintiffs pre-judgment and post-judgment interest;

7.9     Award Plaintiffs such other relief as this Court deems just and proper.


Respectfully submitted,

/s/ Javier Riojas
Javier Riojas
Attorney-in-charge-for-Plaintiffs
TX Bar No.: 16935830
S.D. No. 15162
Texas RioGrande Legal Aid, Inc.
542 East Main Street
P.O. Box 2001
Eagle Pass, Texas 77853
Tel. (830) 752-6400
Fax. (830) 773-5806

Polly Bone
TX Bar No.: 00787102
S.D. No. 16978
Texas RioGrande Legal Aid, Inc.
1111 North Main Avenue
San Antonio, Texas 78212
Fax. (210) 212-3772

Paul Di Blasi
TX Bar No.: 24059254
S.D. No.: 975213
Texas RioGrande Legal Aid, Inc.
316 S. Closner
Edinburg, TX 78539
Ph.: (956) 393-6205
Fax: (956) 383-4688

Weeun Wang
Farmworker Justice
1126 16th Street, NW Suite 270
Washington, D.C. 20036
Tel. (202) 293-5420
Fax: (202)293-5427

ATTORNEYS FOR PLAINTIFFS